UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| In re: | \| | Chapter 11 |
| | \| | |
| PATRIOT STEEL, INC., | \| | Case No. 10-71462-BHL-11 |
| Debtor | \| | |
| | \| | |
| | \| | |

## DEBTOR'S FIRST DAY MOTION #1

**<u>Motion Seeking Interim and Final Approval Authorizing Debtor to Obtain Post-petition
Secured Financing for U.S. Bank National Association as a Senior Lender</u>**
(pursuant to 11 U.S.C. Sections 105(a), 361, 363, 364, 503 and 507 of the Bankruptcy Court)

Patriot Steel Inc., as a debtor-in-possession, submits this Motion for an Interim and Final

Order approving the receipt, use and terms of post-petition secured financing as negotiated

1

between the Debtor and U.S. Bank National Association ("Senior Lender") pursuant to 11 U.S.C. Sections 105(a), 361, 363, 364, 503 and 507.

1. Pursuant to 28 USC Section 1334 and 157, the Court has jurisdiction to hear this Motion. Under 28 U.S.C. Section 157(b)(2)(A)(D) and (O), this matter is a core proceeding.

2. On August 17th 2010, the Debtor filed a voluntary petition for relief ("Case") under Chapter 11 of Title 11 of the United States Code ("Code"), in the United States Bankruptcy Court ("Court") for the Southern District of Indiana. Pursuant to Section 1107(a) and 1108 of the Code, the Debtor is operating its business and managing its property as a debtor-in-possession.

3. No trustee or examiner has been appointed, and no official committee of creditors or equity interest holders has yet been appointed in this Case.

4. Debtor is the operator of a full-line steel service center, possessing inventory of flange beams, I beams, channel, angle, flats rounds, pipe, square tubing, rectangular tubing, sheet steel, plate and grating, which is sold to customers in the fabrication and construction industries. Debtor also processes steel for customers offering cut to length, shearing, forming, custom saw cutting, and high definition plasma burning.

5. Essential to the operation of Debtor's business is the ability to acquire inventory which in turn is sold to customers for a profit.

6.  Debtor no longer has sufficient funds to be able to purchase inventory and meet operating expense and needs access to credit to continue its operation and to reorganize.

7.  Debtor has made reasonable efforts, under its present financial circumstances, to locate unsecured financing of the type contemplated herein, in its ordinary course of business or otherwise, to no avail.

8.  Debtor has made reasonable efforts, under its present financial circumstances, to locate secured financing of the type contemplated herein, in its ordinary course of business or otherwise on more favorable terms and conditions than those provided in the following Senior DIP Loan Documents, and the separately proposed Junior DIP Loan Documents, to no avail.

9.  Debtor, since July 1st 2008 has participated in an asset based lending relationship ("Prepetition Facility") with U.S. Bank National Association ("Senior Lender"), by which Debtor was able to borrow operating funds under revolving loans based upon a formula secured by Debtor's inventory and accounts receivable.

10.  The aggregate unpaid principal, interest, fees, costs and expenses of the loans advanced under the Prepetition Facility is $772,282.72 as of August 16th 2010, all of which is secured by prepetition liens and security interests in Debtor's inventory, accounts and proceeds with a salable value which is at least equal to the Prepetition Indebtedness.

11.  In order to provide Debtor with funds to use for its general operating, working capital and such other general corporate purposes as may be permitted by the Court and applicable law, Debtor has requested Senior Lender provide postpetition financing in an

amount calculated according to a 13 week budgetary projection attached hereto and incorporate herein as **Exhibit A.**

12. Senior Lender has agreed to provide Postpetition financing, but only upon the terms contained in various loan documents attached hereto and incorporated herein as **Exhibit B** as well as any other documents, instruments, or agreements related thereto or delivered to or executed in connection therewith (the "Senior DIP Loan Documents").

13. Under the terms of the proposed post-petition finance agreement, Senior Bank is offering Debtor a revolving - asset based - formula loan in the aggregate principal amount of up to $3,000,000 with the retention of its existing Senior Lender's liens on pre-petition collateral and the granting of additional Senior Liens in favor of U.S. Bank in the form of certain superpriority claims.

14. Debtor also seeks approval of the Junior DIP Financing subject to the terms and conditions describe and set forth in the loan documents described in **Exhibit C** Attached hereto and incorporated herein (the Junior DIP Loan Documents").

15. The relief requested in this Motion is necessary, essential and appropriate for the continued operation of the Debtor's business, and the management and preservation of its property, and in the best interest of the Debtor, its estate and its creditors.

16. The terms and conditions of the Senior DIP Loan Documents have been negotiated in good faith and at arms' length by all parties involved.

4

17. Debtor also requests the scheduling of a final hearing for the purpose of seeking the approval of the relief requested in this Motion on a final basis, with notice as required in the Court's interim order.

18. No Creditor's Committee has been appointed in this case at this time.

19. Debtor has made reasonable efforts to afford the best notice possible of the Interim Hearing and the emergency relief requested in this Motion to those interested parties listed on the attached certificate and in conformity with the requirements set forth in Local Rule B-9013-3(e) and Federal Rules of Bankruptcy Procedure 4001(b)(1)(B).

WHEREFORE, the Debtor prays the Court to enter an Interim Order granting this Motion authorizing Debtors to obtain postpetition  Senior secured financing pursuant to the terms contained in **Exhibit B**; to schedule a final hearing upon this Motion and set forth the notice provisions applicable to said final hearing, and to grant such other relief as is just.

August 17, 2010                              /s/ Maurice Doll
                                             Maurice Doll

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the forgoing has been furnished via electronic transmission, e-mail or U.S. Mail to all interest parties listed below this 17th day of August, 2010.

DISTRIBUTION LIST:

Patriot Steel, Inc.
3350 Claremont Ave.      By fax to 434-4117 & by e-mail to jcook@partiotsteel.com
Evansville, IN 47712

Jack D. Cook
4801 Royal Oak Dr.      By fax to 434-4117 & by e-mail to jcook@patriotsteel.com
Evansville, IN 47720

Chrystal Jones
4801 Royal Oak Dr.      By fax to 434-4117 & by e-mail to cdjinvest@aol.com
Evansville, IN 47720

Investment Concepts LLC
Attn. Chrystal Jones
4801 Royal Oak Dr.      By fax to 434-4117 & by e-mail to cdjinvest@aol.com
Evansville, IN 47720

Patriot Classic Cars
Attn. Jack D. Cook
4801 Royal Oak Dr.      By fax to 434-4117 & by e-mail to cdjinvest@aol.com
Evansville, IN 47720

Patriot Steel Trucking LLC
Attn. Jack D. Cook
3350 Claremont Ave.      By fax to 434-4117 & by e-mail to cdjinvest@aol.com
Evansville, IN 47712

U.S. Bank National Association
c/o Randy LaTour      By fax to 614-719-4752 & by e-mail to RDLaTour@vorys.com
Vorys, Sater, Seymour and Pease LLP      and by e-mail to jcookdubin@vorys.com
52 East Gay Street
Columbus, Ohio 43215

Integra Bank National Association
c/o Mark Samila      By fax to 812-423-3841 & by e-mail to msamila@kddk.com
Kahn, Dees, Donovan & Kahn, LLP
P.O. Box 3646
Evansville, IN 47735

Integra Bank National Association
John W. Whyman, Asst. Vice President
P.O. Box 868              By fax to 812-461-9538 & by e-mail to jwhyman@integrabank,com
Evansville, IN 47705

Ameristeel
c/o Jeffery W. Spear
Duane Morris              By fax to 412-202-4303 & by e-mail to JWSpear@duanemorris.com
600 Grant Street, Suite 5010
Pittsburgh, PA 15219-2802

Ronald J. Moore
Office of the U.S. Trustee
101 W. Ohio St., Suite 1000  By fax to 317-226-6356 & by email to Ronald.Moore@usdoj.gov
Indianapolis, IN 46204

Nucor Corporation
Nucor-Yamato Steel Com
c/o Scott M. Tyler          By fax to 704-378-1963 & by e-mail to scottyler@mvalaw.com
Morre & VanAllen PLLC
Suite 4700
100 North Tryon Street
Charlotte, NC 28202-4003

Atlas Tube
P.O. Box 673318            By fax to 734-738-5604
Detroit, MI 48267-3318

Center Steel Sales, Inc.
c/o Euler Hermes           By fax to 313-386-7205
600 s. 7th St.
Louisville, KY 40201-1672

CMC Steel
P.O. Box 121054            By fax to 214-689-5886
Dallas, TX 75312-1054

Primary Steel Namasco      By fax 678-259-8873 & by e-mail to KJohnson@namasco.com
Attn. Kirk Johnson CFO
500 colonial Center Parkway
Suite 500
Roswell, GA 30076

Schultheis Insurance Agency
P.O. Box 2728              By fax to 812-474-2280
Evansville, IN 47728

Southland Tube, Inc.
Attn. Craig Hill          By e-mail to craig@southlandtube.com
P.O. Box 1205
Birmingham, AL 35201-1205

Steel Dynamics #316
36260 Treasury Center     By fax to 260-969-3590
Chicago, IL 60694

Superior Supply & Steel
P.O. Box 972291           By fax to 337-625-3240
Dallas TX 75397-2291

West Memphis Steel
P.O. Box 697             By fax to 870-732-5280
West Memphis, AR 72301


August 17, 2010                    /s/ Maurice Doll
                          Maurice Doll, Attorney at Law, IN Bar #4554-42
                          Morrie Doll &Associates llc
                          P.O. Box 703
                          Newburgh, IN 47629
                          812-858-5200, fax 812-858-5204
                          morriedoll@hotmail.com

**EXHIBIT A**

## Patriot Steel - Cash Flow
($000's)

| | August Week Ending 8/29/2010 | September Week Ending 9/5/2010 | September Week Ending 9/12/2010 | September Week Ending 9/19/2010 | September Week Ending 9/26/2010 | October Week Ending 10/3/2010 | October Week Ending 10/10/2010 | October Week Ending 10/17/2010 | October Week Ending 10/24/2010 | October Week Ending 10/31/2010 | November Week Ending 11/7/2010 | November Week Ending 11/14/2010 | November Week Ending 11/21/2010 | August | September | October | November |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collateral** | | | | | | | | | | | | | | | | | |
| Beginning A/R | 501 | 481 | 526 | 639 | 810 | 1,008 | 1,262 | 1,408 | 1,489 | 1,506 | 1,542 | 1,573 | 1,602 | | | | |
| Sales | 30 | 98 | 175 | 200 | 250 | 250 | 200 | 200 | 200 | 300 | 250 | 300 | 300 | 30 | 720 | 1,150 | 850 |
| Collections | (50) | (50) | (62) | (29) | (24) | (24) | (54) | (119) | (169) | (224) | (274) | (289) | (211) | | | | |
| Misc. Adjustments | | | | | | | | | | | | | | | | | |
| Ending A/R | 481 | 526 | 639 | 810 | 1,008 | 1,262 | 1,408 | 1,489 | 1,506 | 1,542 | 1,573 | 1,602 | | | | | |
| Ineligibles | 205 | 198 | 191 | 184 | 181 | 178 | 175 | 172 | 169 | 166 | 163 | 180 | 160 | | | | (25) |
| Net A/R | 276 | 328 | 448 | 626 | 827 | 1,084 | 1,233 | 1,317 | 1,337 | 1,376 | 1,410 | 1,423 | 1,442 | | | | |
| ROA | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | | | | |
| Available A/R | 235 | 279 | 381 | 532 | 727 | 921 | 1,048 | 1,119 | 1,123 | 1,190 | 1,199 | 1,201 | 1,277 | | | | |
| Beginning Inventory | 1,130 | 1,181 | 1,268 | 1,310 | 1,371 | 1,391 | 1,370 | 1,391 | 1,412 | 1,513 | 1,492 | 1,552 | 1,571 | | | | (590) |
| Purchases | 76 | 165 | 144 | 205 | 225 | 185 | 185 | 285 | 265 | 285 | 265 | 265 | | | | | |
| Cost of Sales | (25) | (78) | (144) | (164) | (205) | (205) | (164) | (164) | (164) | (246) | (205) | (246) | (246) | | | | |
| Ending Inventory | 1,181 | 1,268 | 1,310 | 1,371 | 1,391 | 1,370 | 1,391 | 1,412 | 1,513 | 1,492 | 1,552 | 1,571 | 1,589 | | | | (697) |
| Ineligibles | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | 81 | | | | |
| Net Inventory | 1,100 | 1,187 | 1,229 | 1,290 | 1,310 | 1,289 | 1,310 | 1,331 | 1,432 | 1,411 | 1,471 | 1,490 | 1,508 | | | | |
| ROA | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | | | | |
| Available Inventory | 660 | 712 | 737 | 774 | 786 | 774 | 786 | 799 | 859 | 847 | 882 | 894 | 905 | | | | |
| Seasonal Overadvance | | | | | | | | | | | | | | | | | |
| **Total Available** | 895 | 991 | 1,118 | 1,306 | 1,512 | 1,695 | 1,834 | 1,918 | 1,982 | 2,037 | 2,055 | 2,095 | 2,182 | | | | |
| **Loan** | | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | 772 | 676 | 698 | 764 | 869 | 1,121 | 1,333 | 1,501 | 1,608 | 1,703 | 1,735 | 1,783 | 1,823 | | | | |
| Collections | (50) | (50) | (62) | (29) | (24) | (24) | (54) | (119) | (199) | (224) | (274) | (289) | (211) | | | | |
| Capital Infusion | (150) | (150) | (100) | (100) | | | | | | | | | | | | | |
| Advances: | | | | | | | | | | | | | | | | | |
| Payables | 81 | 170 | 190 | 230 | 230 | 190 | 190 | 270 | 270 | 270 | 270 | 270 | | | | | |
| Rent | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | | | | |
| Insurance (Hlth & Casualty) | | | | | | | | | | | | | | | | | |
| Utilities | | | | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | | | | | |
| Freight Out | 3 | 5 | 6 | | | | | 7 | | | 5 | 7 | | | | | |
| Interest | | 5 | 5 | 6 | 6 | 6 | 6 | 6 | 7 | 5 | 5 | 5 | | 18 | 24 | 44 | |
| Bank Fees | | | | | | | | | | | | | | | 12 | 44 | |
| Misc. Expenses | 676 | 698 | 764 | 889 | 1,121 | 1,333 | 1,501 | 1,608 | 1,703 | 1,735 | 1,783 | 1,823 | 1,950 | | | | |
| Ending Loan Balance | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | | | | |
| Letters of Credit | | | | | | | | | | | | | | | | | |
| Reserves | | | | | | | | | | | | | | | | | |
| **Ending Availability** | 219 | 293 | 354 | 417 | 392 | 362 | 334 | 310 | 279 | 301 | 272 | 272 | 232 | | | | |
| **Collections:** | | | | | | | | | | | | | | | | | |
| Collection on New Sales | | | | | | | | | | | | | | | | | |
| Existing Accounts Receivable | | | | | | | | 30 | 85 | 175 | 200 | 250 | 250 | 200 | | | | |
| Collection on A/R 0-30 | 20 | 20 | 12 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | | | | 123 | 1,200 |
| Collections on A/R 31-60 | 23 | 23 | 20 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | | | | 190 | |
| Collections on A/R 61-90 | 7 | 7 | 7 | 5 | 5 | 5 | 5 | 3 | 3 | 3 | 3 | 3 | | | | 114 | |
| Collections on A/R 91+ | 50 | 50 | 62 | 29 | 24 | 24 | 54 | 119 | 199 | 224 | 274 | 269 | 211 | | | 52 | |
| **Accounts Payable** | | | | | | | | | | | | | | | | | |
| Beginning Accounts Payable | 3,743 | 3,738 | 3,733 | 3,728 | 3,723 | 3,718 | 3,713 | 3,708 | 3,703 | 3,698 | 3,693 | 3,688 | 3,683 | | | | |
| Purchases | 76 | 165 | 185 | 225 | 225 | 185 | 185 | 185 | 265 | 225 | 265 | 265 | 265 | | | | |
| Disbursements | (81) | (170) | (190) | (230) | (230) | (190) | (190) | (190) | (270) | (230) | (270) | (270) | (270) | | | | |
| Ending Accounts Payable | 3,738 | 3,733 | 3,728 | 3,723 | 3,718 | 3,713 | 3,708 | 3,703 | 3,698 | 3,693 | 3,688 | 3,683 | 3,678 | | | | |
| Disbursements on existing AP | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (18) | (10) | (643) | (66) |
| Disbursements on new steel purcha... | (76) | (185) | (185) | (225) | (225) | (185) | (185) | (185) | (270) | (225) | (270) | (285) | (285) | 23 | 140 | 168 | 159 |
| | (81) | (190) | (190) | (230) | (230) | (190) | (190) | (190) | (265) | (230) | (270) | (270) | (270) | | | 42 | |

**Assumptions:**
1) October A/R on new A/R is 42 days.
2) An additional $25K of inventory will be purchased each week to replenish stock.
3) November loss is due to only 3 weeks sales with a full month of rent reflected.

## AMENDED AND RESTATED FINANCING AGREEMENT AND
## FORBEARANCE AGREEMENT WITH DEBTOR IN POSSESSION

THIS AMENDED AND RESTATED FINANCING AGREEMENT AND FORBEARANCE AGREEMENT WITH DEBTOR IN POSSESSION (this "Agreement"), entered into as of August 16, 2010 (the "Signature Date") to be effective as of August 16, 2010 (the "Effective Date"), by and among PATRIOT STEEL, INC., an Indiana corporation ("Borrower"), JACK D. COOK, an individual and resident of the State of Indiana ("Mr. Cook"), CHRYSTAL D. JONES, an individual and resident of the State of Indiana ("Ms. Jones" and together with Mr. Cook, each a "Guarantor" and, collectively, "Guarantors"), and U.S. BANK NATIONAL ASSOCIATION, a national banking association ("Bank"), is as follows:

### Recitals

A.    Borrower and Bank entered into a Financing Agreement dated as of July 1, 2008 (as may be amended from time to time, the "Financing Agreement"). Capitalized terms which are used, but not defined, in this Agreement will have the meanings given to them in the Financing Agreement, except as otherwise expressly provided.

B.    In connection with the Financing Agreement, Borrower, Guarantors and Bank are parties to a Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated as of March 27, 2009, as amended by a First Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of June 26, 2009, a Second Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of August 26, 2009, a Third Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of November 26, 2009, and a Fourth Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of February 24, 2010 (as amended, the "Forbearance Agreement"), which Forbearance Agreement, among other things, memorializes the terms and conditions on which Bank will conditionally and temporarily forbear from exercising all of the Acceleration Rights.

C.    Further in connection with the Financing Agreement, Borrower executed and delivered to Bank the Revolving Loan Note dated as of July 1, 2008, in the principal amount of $12,000,000, as amended and restated by: (1) the First Amended and Restated Revolving Loan Note dated as of March 27, 2009 in the principal amount of $9,000,000; (2) the Second Amended and Restated Revolving Loan Note dated as of June 26, 2009 in the principal amount of $6,000,000; (3) the Third Amended and Restated Revolving Loan Note dated as of August 26, 2009 in the principal amount of $6,000,000; (4) the Fourth Amended and Restated Revolving Loan Note dated as of November 26, 2009 in the principal amount of $5,000,000; and (5) the Fifth Amended and Restated Revolving Loan Note dated as of February 24, 2010 in the principal amount of $4,750,000. As used herein, the term "Prior Note" is intended to refer to the Fifth Amended and Restated Revolving Loan Note dated as of February 24, 2010 in the principal amount of $4,750,000; the term "Amended and Restated Note" or "Note" refers to the Amended and Restated Revolving Loan Note in the form of **Exhibit A** to this Agreement.



EXHIBIT B

D.     As security for the Obligations (as defined in the Financing Agreement), Borrower executed and delivered to Bank a Security Agreement dated as of July 1, 2008 (the "Security Agreement").

E.     Each Guarantor executed and delivered to Bank a Guaranty dated as of July 1, 2008 (each a "Guaranty" and, collectively, the "Guaranties"). Under the Guaranties, each Guarantor absolutely, irrevocably and unconditionally guaranteed to Bank (i) payment of the Note and (ii) payment and performance of all other Obligations (collectively, the "Guaranteed Obligations").

F.     There have occurred and continue to exist Events of Default under the Loan Documents, including, without limitation, the following (collectively, the "Existing Defaults"):

(1)     pursuant to Section 10.28 of the Financing Agreement with respect to the Fixed Charge Coverage Ratio set forth in Section 1 of Schedule 10.28 to the Financing Agreement for at least the periods ending November 30, 2008 through May 31, 2009 (the "Existing FCCR Defaults");

(2)     a Forbearance Default pursuant to Section 2.2 of the Forbearance Agreement as a result of the failure of Borrower's Revolving Loan Availability to be greater than $100,000 for the period commencing May 28, 2009 through, and including, June 1, 2009 (the "Excess Availability Default");

(3)     Forbearance Defaults pursuant to Section 2.2 of the Forbearance Agreement as a result of the failure of Borrower's Revolving Loan Availability to be greater than $200,000 at all times during the period commencing November 26, 2009 through, and including, February 24, 2010 (collectively, the "Additional Excess Availability Defaults"); and

(4)     a Forbearance Default pursuant to Section 7.1(a) of the Forbearance Agreement as a result of Debtors' failure to pay the outstanding balance of the Prior Note on or before February 24, 2010

Borrower has advised Bank that absent Borrower's bankruptcy filing, discussed below, and infusion of at least $500,000 in additional lending by Mr. Cook, Ms. Jones and Investment Concepts, LLC (collectively, "Junior Lender"), additional Forbearance Defaults would occur for the month ending August 31, 2010.

G.     Absent Borrower's bankruptcy filing, the Existing Defaults permit Bank to immediately exercise any and all rights and remedies provided in the Loan Documents and pursuant to applicable law (collectively, the "Rights and Remedies"). Without limiting the generality of the foregoing, the Rights and Remedies specifically include Bank's immediate rights to: (i) declare all of the Obligations to be immediately due and payable, (ii) terminate the Financing Agreement, and (iii) realize upon and enforce Bank's rights: (a) to collect all of the Obligations, (b) with respect to all of the Loan Collateral (as defined in the Financing

2

Agreement), and (c) as otherwise provided by applicable law to commence legal actions and other legal proceedings with respect to any or all of the foregoing (such rights under clauses (i) through, and including, (iii) being called, collectively, the "Acceleration Rights").

H.     Borrower has advised Bank that Borrower intends to file its Petition on or about August 10, 2010 in the Bankruptcy Court. Borrower and Guarantors (collectively, "Debtors") have requested that Bank extend DIP Financing to Borrower, which Bank has agreed to do, all on, and subject to, the terms and conditions set forth in this Amendment.

I.     Bank and Debtors wish to amend and restate certain provisions contained in the Financing Agreement and Forbearance Agreement as set forth herein.

J.     Under section 364 of the U.S. Bankruptcy Code, Borrower can only obtain financing after the date on which the Petition is filed (the "Petition Date") with the approval of the Bankruptcy Court. Provided that such approval is granted by means of an Interim Order of the Bankruptcy Court in a form approved in writing by Bank, Bank and Debtors have agreed that the DIP Financing will mature 21 days after the Petition Date. Upon approval of the DIP Financing by a Final Order of the Bankruptcy Court in a form approved in writing by Bank, Bank and Debtors have agreed that the DIP Financing will mature 26 weeks after the Petition Date. Due to certain provisions of the Bankruptcy Court's Local Bankruptcy Rules, certain terms of this Agreement will only become effective upon entry of the Final Order.

K.     Bank and Debtors have agreed that the Existing Defaults and Additional Excess Availability Defaults under the Loan Documents shall not be waived by Bank, but instead shall continue to exist. Upon the filing of the Petition, the total indebtedness under the Loan Documents will automatically be accelerated. Subsequently, despite the Existing Defaults and Additional Excess Availability Defaults but provided there is no DIP Default (as defined below), Bank will continue to forbear from enforcing or seeking permission from the Bankruptcy Court to enforce Bank's rights under the Loan Documents.

## Statement of Agreement

In consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bank and Debtors hereby agree as follows:

1.     **Amendment and Restatement of Financing Agreement and Forbearance Agreement.**

1.1.    Financing Agreement. Bank and Debtors hereby agree that the Financing Agreement shall be amended and restated by incorporating the Financing Agreement by reference herein with the amendments thereto as if expressly set forth herein.

1.2.  <u>Forbearance Agreement</u>.  Bank and Debtors hereby agree that the Forbearance Agreement shall be amended and restated by incorporating the Forbearance Agreement by reference herein with the amendments thereto as if expressly set forth herein.

## 2.  <u>Recitals; Acknowledgment of Debt; Reaffirmation of Obligations and Related Agreements</u>.

2.1.  <u>Recitals</u>.  Each of the above Recitals is incorporated herein and deemed to be the agreement of Bank and Debtors, and each Debtor acknowledges that each Recital is true and correct, and that it is being relied upon by Bank in agreeing to the terms of this Agreement.

2.2.  <u>Acknowledgment of Obligations</u>.  Each Debtor acknowledges and confirms that, but for this Agreement, each Debtor is presently obligated, jointly and severally, to immediately pay all of the Obligations, all without offset, defense, recoupment or counterclaim. Each Debtor acknowledges and confirms that, as of August 16, 2010, the outstanding principal amount of, and accrued but unpaid interest and fees on, the Indebtedness evidenced by the Note is $772,282.72. Each Debtor agrees that such Debtor does not have any claim or defense of any kind, by way of offset or otherwise, to the payment or performance of all of the Obligations whether pursuant to the Loan Documents or otherwise.

2.3.  <u>Ratifications; Reaffirmations</u>.

2.3.1.  *Ratification of Loan Documents; References*.  Except as expressly amended hereby, and subject to Subsection 8.2 of this Agreement, all terms, conditions and obligations of the Loan Documents are hereby ratified and confirmed and remain in full force and effect.  Each Debtor hereby agrees that all representations and warranties in the Loan Documents to which such Debtor is a party are true and accurate as of the date hereof: (a) except to the extent, if any, modified by this Agreement, (b) except to the extent that any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty was true and correct on such earlier date, and (c) subject to those changes as are not prohibited by, or do not constitute Events of Default under, the Loan Documents. Each Debtor further reaffirms all covenants in the Loan Documents to which such Debtor is a party. Debtors and Bank agree that any reference to (i) the Financing Agreement will be treated as a reference to the Financing Agreement as amended by the Forbearance Agreement and this Agreement and (ii) the Note will be treated as a reference to the Amended and Restated Note.

2.3.2.  *Reaffirmation of Grants of Security as to Prepetition Loan Collateral*.  Without limiting the generality of the ratifications and reaffirmations contained elsewhere in this Agreement, and subject to Subsection 8.2 of this Agreement, Borrower hereby ratifies and reaffirms any and all grants to Bank of Liens on the Loan Collateral as security for all Obligations that arose Prepetition and acknowledges and confirms that the grants of the Liens on the Loan Collateral (a) represent continuing Liens on all of the Loan Collateral, (b) secure all of the Obligations, and (c) represent valid first priority Liens on the Loan Collateral, except to the extent of any Permitted Liens.

4

2.3.3. *Grant of Security Interest as to Postpetition Loan Collateral.* As security for the prompt payment and performance when due (whether at stated maturity, by acceleration, by early termination, or otherwise) of all Obligations arising Postpetition, Borrower shall, pursuant to the Final Order, and hereby does, assign, convey, mortgage, pledge, hypothecate and grant to Bank a first priority perfected security interest in all Loan Collateral in which Borrower first acquires an interest Postpetition, except to the extent of any Permitted Liens.

2.3.4. *Reaffirmation of Guaranties.* Without limiting the generality of the ratifications and reaffirmations contained elsewhere in this Agreement, each Guarantor hereby: (a) ratifies and reaffirms the applicable Guaranty and (b) acknowledges and agrees that no Guarantor is released from his or her obligations under the applicable Guaranty by reason of any of the Existing Defaults, this Agreement or the other Loan Documents and that the obligations of each Guarantor under the applicable Guaranty extend, among other Obligations of Borrower to Bank, to the Obligations of Borrower under this Agreement and the other Loan Documents being amended, or amended and restated, in connection herewith. The reaffirmations set forth in this Section 2.3.4 shall not be construed, by implication or otherwise, as imposing any requirement that Bank notify or seek the consent of any Guarantor relative to any past or future extension of credit, or modification, extension or other action with respect thereto, in order for any such extension of credit or modification, extension or other action with respect thereto to be subject to the applicable Guaranty, it being expressly acknowledged and reaffirmed that each Guarantor has under his or her Guaranty consented, among other things, to modifications, extensions and other actions with respect thereto without any notice thereof or further consent thereto.

2.4.   No Novation Until Final Order Entered.   Notwithstanding any other provision of this Section 2, each Debtor acknowledges and agrees that until the Final Order is entered, this Agreement does not discharge or cancel the existing Indebtedness owing by any Debtor to Bank. Without limiting the generality of the foregoing, Debtors and Bank hereby expressly intend that until the Final Order is entered, this Agreement shall not in any manner: (i) constitute the refinancing, refunding, payment or extinguishment of any of the Obligations evidenced by the existing Loan Documents; (ii) be deemed to evidence a novation of the outstanding balance of the Obligations; or (iii) affect, replace, impair, or extinguish the creation, attachment, perfection or priority of the security interests in, and other Liens on, the Loan Collateral granted pursuant to any agreements, instruments or other documents evidencing or creating a Lien on the Loan Collateral.

3.   **Amendments to Financing Agreement**.

3.1.   Capitalized terms which are used, but not defined, in this Section 3 of this Agreement will have the meanings given to them in the Financing Agreement.

3.2.   Amendment to Subsection 1.1 of the Financing Agreement. Subsection 1.1 of the Financing Agreement is hereby amended by:

5

(i) adding the following new definitions, in their proper alphabetical orders, to provide in their respective entireties as follows:

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Indiana.

"Cash Flow Budget" means the 13-week cash flow budget attached hereto as **Exhibit B** and any update thereto or subsequent budget to which Bank and Borrower agree in writing.

"Debtors" means Borrower and the Individual Guarantors.

"DIP Default" means (i) after entry of the Interim Order but prior to entry of the Final Order, any Event of Default as defined by the Interim Order; (ii) after entry of the Final Order, any Event of Default as defined by the Final Order; (iii) within five days following the end of any calendar month ending on or after September 30, 2010 in which the Fixed Charge Coverage Ratio (as defined in Schedule 10.28) falls below 1.0:1, failure of Junior Lender to lend any funds necessary to increase the Fixed Charge Coverage Ratio to at least 1.0:1; (iv) default under the any challenge by Debtors to the extent, validity, priority, or unavoidability of Bank's liens or security interests securing the Loans; (v) any attempt by Debtors to vacate, stay, modify or supersede the Interim Order or the Final Order without Bank's prior written consent; (vi) entry of any order reversing, staying, vacating or superseding the Interim Order (other than the Final Order) or the Final Order, without Bank's prior written consent; (vii) the granting of any Lien, other than the Permitted Liens, which is *pari passu* with or senior to Bank's Liens; (viii) any provision of the Interim Order, Final Order or Loan Documents ceases to be valid, binding and enforceable on Debtors, or any assertion by Debtors that the same should be determined; (ix) the Bankruptcy Court's authorization for the DIP Financing terminates or lapses; (x) failure of Borrower to provide any Cash Flow Budget subsequent to the initial Cash Flow Budget attached hereto as **Exhibit B** within the time provided by Subsection 8.2A of this Agreement; and (xi) the calling, rescission, cancellation or other withdrawal of the Junior Loan.

"DIP Financing" means financing provided by Bank to Borrower, Postpetition, in accordance with section 364 of the U.S. Bankruptcy Code and this Agreement.

"Final Order" means a duly entered order of the Bankruptcy Court, in a form approved in writing by Bank, authorizing Borrower to obtain DIP Financing from Bank, following a hearing held at least 14 days after

6

service of Borrower's motion to authorize the DIP Financing, within the meaning of Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure.

"Interim Order" means a duly entered order of the Bankruptcy Court, in a form approved in writing by Bank, authorizing Borrower to obtain DIP Financing from Bank on an "interim" (within the meaning of Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure) basis, e.g., such an order that is entered within the first 13 days after the Petition Date, before all of Borrower's creditors have received notice that Bank and Borrower are proposing to enter into the DIP Financing Agreement.

"Junior Lender" means Mr. Cook, Ms. Jones and Investment Concepts, LLC, collectively.

"Junior Loan" means the advance of funds referenced in Subsection 2.4A of this Agreement.

"Maturity Date" means (i) prior to entry of the Interim Order, June 24, 2010; (ii) after entry of the Interim Order but prior to entry of the Final Order, the date 21 days following entry of the Interim Order; and (iii) after entry of the Final Order, February 14, 2011.

"Petition" means the voluntary chapter 11 bankruptcy petition that Borrower has indicated it intends to file on or about August 10, 2010; provided, however, that it shall not refer to (i) a petition under any chapter of bankruptcy relief other than chapter 11, (ii) any subsequent bankruptcy petition filed in respect of Borrower, or (iii) any bankruptcy petition filed in respect of Borrower after August 31, 2010.

"Petition Date" means the date the Petition is filed.

"Postpetition" means the period from the Petition Date through the occurrence of any Termination Event (as defined in the Forbearance Agreement).

"Prepetition" means the period preceding the Petition Date.

(ii)  deleting the definitions of the terms "Forbearance Agreement," "Integra Forbearance Agreement," "Inventory Sublimit," "Loan Documents," and "Maximum Revolving Commitment" and substituting in lieu thereof the following definitions, respectively:

"Forbearance Agreement" means the Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated as of

7

March 27, 2009, as amended by a First Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of June 26, 2009, a Second Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of August 26, 2009, a Third Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of November 26, 2009, and a Fourth Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of February 24, 2010, as further amended, restated, modified, supplemented, or replaced from time to time.

"Integra Forbearance Agreement" means the Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated as of March 27, 2009, among Borrower, Bank and Integra, as amended by the First Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of June 26, 2009, the Second Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of August 26, 2009, the Third Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of November 26, 2009, the Fourth Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of February 24, 2010, and the Fifth Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of August 16, 2010, and as further amended, restated, modified, supplemented, or replaced from time to time.

"Inventory Sublimit" means an amount equal to $2,000,000.00.

"Loan Documents" means this Agreement (as amended, restated, supplemented, extended, refinanced, or otherwise modified from time to time), the Forbearance Agreement, the Note, the Security Agreement, the Letter of Credit Documents, the Integra Letter Agreement, the Tax Payment Agreement, the Rate Hedging Agreements, and all other agreements, instruments and documents relating to the Loans, including mortgages, deeds of trust, security agreements, subordination agreements, Integra Letter agreements, pledges, powers of attorney, consents, collateral assignments, locked box and cash management agreements, letter agreements, contracts, notices, leases, financing statements and letters of credit and applications therefor and all other writings, all of which must be in form and substance satisfactory to Bank, which have been, are as of the date of this Agreement, or will in the future be signed by, or on behalf of, Borrower and delivered to Bank.

8

"Maximum Revolving Commitment" means an amount equal to $3,000,000.

3.3.   Amendment to Section 2 of the Financing Agreement. Section 2 of the Financing Agreement is hereby amended by adding the following Subsection 2.4A immediately after Subsection 2.4 thereof:

"2.4A Junior Loan. Notwithstanding anything in this Agreement to the contrary, after August 1, 2010, Bank shall not be obligated to make any Loan, any advance of credit or issue any Letter of Credit unless Junior Lender advances to Borrower the sums listed as "Capital Infusion" in the Cash Flow Budget, on the schedule stated in the Cash Flow Budget."

3.4.   Amendment to Subsection 2.5 of the Financing Agreement. Subsection 2.5 of the Financing Agreement is hereby amended by adding the following Paragraph 2.5.3 immediately after Paragraph 2.5.2 thereof:

"2.5.3   Irrevocable Advance Request Upon Entry of Final Order. Effective upon entry of the Final Order, Borrower hereby irrevocably requests and authorizes Bank, without any further written or oral request of, or notice to, Borrower, to make a Revolving Loan in an amount equal to the lesser of (i) the outstanding balance on the Obligations and (ii) the Borrowing Base (both as measured at the time of entry of the Final Order); provided, however, that if a Deficiency exists at the time of entry of the Final Order (i.e., if the outstanding balance on the Obligations exceeds the Borrower Base), Bank may, in its sole discretion, elect to make the Revolving Loan in the full amount of the outstanding balance on the Obligations. The Revolving Loan requested pursuant to this Paragraph 2.5.3 is to be made as a Prime Rate Revolving Loan and shall be made by crediting the amount of the Revolving Loan to the outstanding balance on the Obligations."

3.5.   Amendment to Subsection 2.6 of the Financing Agreement. The first two sentences of Subsection 2.6 of the Financing Agreement are hereby amended by deleting such sentences in their entirety and substituting in lieu thereof the following:

"2.6   Borrower's obligation to pay the principal of, and interest on, the Loans (exclusive of the Letter of Credit Exposure) made by Bank shall be evidenced by a promissory note duly executed and delivered by Borrower substantially in the form of Exhibit A attached to the Amended and Restated Financing Agreement and Forbearance Agreement with Debtor In Possession with blanks appropriately completed in conformity herewith (the "Revolving Loan Note"). The Revolving Loan Note issued to Bank shall (a) be executed by Borrower, (b) be payable to the order of Bank and be dated as of August 16, 2010, (c) be in a stated principal

amount equal to the Maximum Revolving Commitment, (d) mature on the Maturity Date, (e) bear interest as provided in <u>Section 3.1</u> in respect of the Prime Rate Loans and LIBOR Rate Loans, as the case may be, evidenced thereby, (f) be subject to voluntary prepayment and mandatory repayment as provided herein, and (g) be entitled to the benefits, and be subject to the terms, of this Agreement and the other Loan Documents."

    3.6.   <u>Amendment to Section 7 of the Financing Agreement</u>. Section 7 of the Financing Agreement is hereby amended by adding the following new Subsection 7.4A immediately after Subsection 7.4 thereof:

> "7.4A  <u>Application of Proceeds; Treatment of Funds Received Prior to Entry of Final Order</u>. Bank shall use reasonable efforts to avoid applying Remittances and other proceeds of Loan Collateral, which Loan Collateral Borrower obtains for the first time Postpetition, to Obligations that arose Prepetition. Debtors and Bank hereby agree that there shall be a rebuttable presumption that all Remittances received by Bank or Borrower prior to entry of the Final Order are Remittances or other proceeds on account of Loan Collateral in which Borrower first obtained an interest Prepetition, and that such Remittances would themselves be considered Loan Collateral arising Prepetition pursuant to section 552(b) of the U.S. Bankruptcy Code. Borrower is entitled to rebut the presumption created by this Subsection by sending to Bank a written notice (a "Notice of Postpetition Funds") prior to entry of the Final Order, stating that Borrower believes that a specifically identified Remittance is a payment on account of Loan Collateral that arose Postpetition, and including a copy of (a) the invoice sent by Borrower to the applicable account debtor or other customer of Borrower, and (b) proof of delivery, to such account debtor or other customer, of the goods reflected in such invoice. If Borrower and Bank are unable to agree whether the Loan Collateral related to the Remittance identified in the Notice of Postpetition Funds arose Prepetition or Postpetition, Borrower shall, within five Business Days of the sending of a Notice of Postpetition Funds, file a motion with the Bankruptcy Court seeking judicial resolution of the parties' dispute. If Borrower does not send a Notice of Postpetition Funds concerning a particular Remittance or other proceeds of Loan Collateral, Bank shall be conclusively presumed to have used reasonable efforts to avoid improperly applying such Remittance or other proceeds to Obligations that arose Prepetition."

    3.7.   <u>Amendment to Section 8 of the Financing Agreement</u>. Section 8 of the Financing Agreement is hereby amended by adding the following new Subsection 8.2A immediately after Subsection 8.2 thereof:

10

"8.2A   <u>Cash Flow Budget</u>.   The Cash Flow Budget attached hereto as **Exhibit B** shall serve as the Cash Flow Budget for the first 13-week Postpetition period.   Borrower shall propose a subsequent Cash Flow Budget for the second 13-week Postpetition period no later than November 14, 2010.   Borrower and Bank may agree, in writing, to amend any Cash Flow Budget, subject to the terms of the Interim Order and Final Order."

3.8.   <u>Amendment to Subsection 11.1 of the Financing Agreement</u>.   The reference to "June 24, 2010" in Subsection 11.1 of the Financing Agreement is hereby amended by deleting such reference and substituting in lieu thereof a reference to "the Maturity Date."

3.9.   <u>Amendment to Subsection 12.1 of the Financing Agreement</u>.   Section 12.1 of the Financing Agreement is hereby amended by adding the following paragraphs (t) and (u), respectively, immediately after paragraph (s) thereof: "(t)   There occurs a Forbearance Default (as defined in the Forbearance Agreement); and (u)   There occurs a DIP Default."

3.10.   <u>Amendment to Schedule 10.28 to the Financing Agreement</u>.   Schedule 10.28 to the Financing Agreement is hereby amended by deleting such Schedule in its entirety and substituting in lieu thereof the Schedule 10.28 attached to this Amendment and Restatement.

4.   **<u>Amendments to Forbearance Agreement</u>**.

4.1.   Capitalized terms which are used, but not defined, in this <u>Section 4</u> of this Agreement will have the meanings given to them in the Forbearance Agreement.

4.2.   <u>Amendment to "Recitals" Section, Paragraph A</u>.   The first sentence of Paragraph A of the Recitals of the Forbearance Agreement is hereby amended by deleting such sentence in its entirety and substituting in lieu thereof the following: "Borrower and Bank entered into a Financing Agreement dated as of July 1, 2008 (as may be amended from time to time, the "Financing Agreement"), as amended and restated by a certain Amended and Restated Financing Agreement and Forbearance Agreement with Debtor in Possession (the "Amended and Restated Financing Agreement")."

4.3.   <u>Amendment to "Recitals" Section, Paragraph F</u>.   Paragraph F of the Recitals of the Forbearance Agreement is hereby amended by deleting Paragraph in its entirety and substituting in lieu thereof the following:

"F.   There have occurred and continue to exist Events of Default under the Loan Documents, including, without limitation, the following (collectively, the "<u>Existing Defaults</u>"):

(1)   pursuant to <u>Section 10.28</u> of the Financing Agreement with respect to the Fixed Charge Coverage Ratio set forth in <u>Section 1</u> of <u>Schedule 10.28</u> to the Financing Agreement for at least the periods ending

11

November 30, 2008 through May 31, 2009 (the "Existing FCCR Defaults");

(2)    a Forbearance Default pursuant to Section 2.2 of the Forbearance Agreement as a result of the failure of Borrower's Revolving Loan Availability to be greater than $100,000 for the period commencing May 28, 2009 through, and including, June 1, 2009 (the "Excess Availability Default");

(3)    Forbearance Defaults pursuant to Section 2.2 of the Forbearance Agreement as a result of the failure of Borrower's Revolving Loan Availability to be greater than $200,000 at all times during the period commencing November 26, 2009 through, and including, February 24, 2010 (collectively, the "Additional Excess Availability Defaults"); and

(4)    a Forbearance Default pursuant to Section 7.1(a) of the Forbearance Agreement as a result of Debtors' failure to pay the outstanding balance of the Prior Note on or before February 24, 2010."

4.4.    <u>Amendment to Section 1 of the Forbearance Agreement</u>. Section 1 of the Forbearance Agreement is hereby amended by deleting such section in its entirety and substituting in lieu thereof <u>Section 2</u> of this Agreement.

4.5.    <u>Amendment to Section 2.1(a) of the Forbearance Agreement</u>. Section 2.1(a) of the Forbearance Agreement is hereby amended by deleting such subsection in its entirety and substituting in lieu thereof the following:

"2.1    <u>Forbearance</u>.

(a)    Subject to the satisfaction of the conditions precedent set forth in this Agreement, Bank agrees that until the Maturity Date (as defined in the Financing Agreement), Bank will forbear from the exercise of the Acceleration Rights against Debtors solely with respect to the Existing Defaults; *provided, however*, (i) Debtors shall comply with all limitations, restrictions or prohibitions that would otherwise be effective or applicable under the Loan Documents during the continuance of any Event of Default, (ii) nothing in this Agreement shall amend or modify any provision of any Loan Document with respect to Bank's Rights and Remedies other than the Acceleration Rights, and (iii) nothing in this Agreement shall restrict, impair or otherwise affect Bank's Rights and Remedies (other than the Acceleration Rights), whether as a result of the occurrence or continuation of any Existing Defaults or otherwise, including: (A) under any third-party agreements containing subordination

12

provisions, or any other third-party agreements, in favor of Bank, and (B) Bank's rights to implement Reserve Amounts against the Borrowing Base, reduce Advance Rates, exercise its other rights in respect of the Loan Collateral or refuse to honor any check or payment order presented for payment for which Borrower does not have sufficient funds to satisfy the payment demanded thereon."

4.6.    Amendment to Section 2.1(b) of the Forbearance Agreement.    Section 2.1(b) of the Forbearance Agreement is hereby amended by adding the following sentence immediately after the final sentence thereof:

"As used herein, "Termination Event" means the occurrence of any of the following: (A) the Maturity Date; (B) the occurrence of any Forbearance Default (other than the Existing Defaults); or (C) the occurrence of any DIP Default (as defined in the Financing Agreement)."

4.7.    Amendment to Section 2.3 of the Forbearance Agreement.    (a) The references to "during the Forbearance Period" in Section 2.3 of the Forbearance Agreement are hereby amended by omitting such references in their entirety therefrom.

(b)    The phrase "not less frequently than weekly, and more frequently if Bank shall require or Borrower shall so elect" in Section 2.3 of the Forbearance Agreement is hereby amended by substituting the following in lieu thereof: "on a daily basis".

(c)    Section 2.3 of the Forbearance Agreement is hereby further amended by omitting the following language therefrom:

"; *provided* that, so long as (a) Borrower's Past-Due Receivables Percentage is, and continues to be, less than 5% as of the end of, and for each of, the immediately preceding two calendar months, and (b) Bank has not, in good faith, determined that Borrower's financial condition or performance or Revolving Loan Availability has materially diminished from that which exists on the Effective Date, Borrower may deliver to Bank the General Ineligible Report in accordance with the Financing Agreement on a monthly basis so long as Borrower continues to deliver to Bank, the Agings Report and the Inventory Report on a weekly basis".

4.8.    Amendment to Section 2.4 of the Forbearance Agreement.    The references to "during the Forbearance Period" in Section 2.4 of the Forbearance Agreement are hereby amended by omitting such references in their entirety therefrom.

4.9.    Amendment to Section 3A of the Forbearance Agreement.    Section 3A of the Forbearance Agreement is hereby amended in its entirety by substituting the following in its place:

"3A.    [Intentionally omitted]."

**5.    Representations.**  To induce Bank to enter into this Agreement, each Debtor hereby represents and warrants to Bank as follows:

5.1.    <u>Power and Authority</u>.  Each Debtor has full power and authority to enter into, and to perform its, his or her obligations under, this Agreement and the other Loan Documents being executed or amended in connection herewith, and the execution and delivery of, and the performance of its, his or her obligations under and arising out of, this Agreement and such other Loan Documents have been duly authorized, as applicable in the case of Borrower, by all necessary corporate action; provided, however, that Bank acknowledges that Borrower's execution of this Agreement is subject to the approval of the Bankruptcy Court.

5.2.    <u>Legal, Valid and Binding Obligation</u>.  This Agreement and the other Loan Documents being executed or amended in connection herewith constitute the legal, valid and binding obligations of Debtors enforceable in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally.

5.3.    <u>Good Standing</u>.  Borrower is a duly organized corporation and is and shall remain validly existing and in good standing under the laws of the State of its organization. Borrower is and shall remain qualified to do business as a foreign corporation under the laws of each jurisdiction in which the failure to be so qualified would have a material adverse affect on Borrower's assets, operations, or financial condition or on Borrower's ability to collect its Receivables.

5.4.    <u>Deposit Accounts</u>.  All of Borrower's deposit accounts are at Bank other than the Integra Deposit Account.

5.5.    Except as set forth herein, Debtors hereby agree that all representations and warranties in the Loan Documents are true and accurate as of the date hereof.  Debtors further reaffirm all covenants in the Loan Documents.

6.    **Conditions Precedent.**  On or prior to the time and date that Bank executes this Agreement, and as a condition to the effectiveness of this Agreement, each of the following conditions precedent shall have been satisfied in the sole judgment of Bank:

6.1.    <u>Amended and Restated Note; Additional Documents and Deliveries</u>. Debtors, as applicable, shall execute and deliver to Bank or, as applicable, cause to be executed and delivered to Bank: (a) the Amended and Restated Revolving Loan Note (the "<u>Amended and Restated Note</u>") in the form of **Exhibit A** to this Agreement; (b) a Certificate Regarding Resolutions for Borrower in form and substance acceptable to Bank, together with the resolutions set forth therein, and (c) all other documents, instruments, certificates and agreements deemed necessary or desirable by Bank to effect the transactions contemplated by this Agreement.

14

6.2.    Legality of Transactions.  No change in applicable law shall have occurred as a consequence of which it shall have become and continue to be unlawful (a) for Bank to perform any of its agreements or obligations under any of the Loan Documents, or (b) for any Debtor to perform any of such Debtor's agreements or obligations under any of the Loan Documents.

6.3.    Performance, Etc.  Except as set forth herein, each Debtor shall have duly and properly performed, complied with and observed each of such Debtor's covenants, agreements and obligations contained in each of the Loan Documents.  Except for the Existing Defaults, no event shall have occurred on or prior to the Signature Date, and no condition shall exist on the Signature Date, which constitutes a default or an event of default under any Loan Document.

6.4.    Proceedings and Documents.  All corporate, governmental and other proceedings in connection with the transactions contemplated on the Signature Date, each of the Loan Documents and all instruments and documents incidental thereto shall be in form and substance satisfactory to Bank.

6.5.    Changes; None Adverse.  Subsequent to the date on which the most recent financial statements of Debtors were delivered to Bank, and other than the contemplated filing of the Petition by Borrower, no changes shall have occurred in the actual or projected assets, liabilities, financial condition, business, operations or prospects of any Debtor which, individually or in the aggregate, are material to Debtors, and Bank shall have completed such review of the status of all current and pending legal issues as Bank shall deem necessary or appropriate.

6.6.    Integra Forbearance Documents.  Debtors, as applicable, shall execute and deliver to Bank or, as applicable, cause to be executed and delivered to Bank, an amendment to the Integra Forbearance Agreement duly executed by Debtors and Integra and each other document, instrument, certificate and agreement executed or delivered in connection therewith (collectively, the "Integra Forbearance Documents").  The Integra Forbearance Documents shall be in form and substance satisfactory to Bank and shall, among other things, evidence Integra's forbearance from its rights and remedies against Debtors and the Integra Collateral (as defined in the Integra Letter Agreement) with respect to the existing Integra Debt Defaults.

7.    **Acknowledgment of Existing Defaults; Non-Waiver.**  By executing this Agreement, each Debtor acknowledges and agrees that the Existing Defaults: (a) currently exist and are uncured pursuant to the Forbearance Agreement and the other Loan Documents and (b) have not been waived by Bank in accordance with the Forbearance Agreement or any other Loan Document or otherwise.  Each Debtor acknowledges that the execution of this Agreement, the execution of prior amendments of any of the Loan Documents or any course of dealing or action or inaction by Bank did not and do not constitute a waiver of the Existing Defaults, the Expected Financial Covenant Defaults, or any DIP Default.  Further, each Debtor expressly acknowledges that (i) Bank has not made and is not making any commitment for, and that there

15

is no understanding, explicit or implicit, relating to, or affecting, financing for any time beyond what is expressly provided for in this Agreement or for any forbearance beyond that expressly provided in this Agreement and (ii) Bank has made no commitment with respect to, and there is no understanding explicit or implicit, relating to or affecting the terms of any further restructure or workout which may be entered into between the parties.

8.    **Miscellaneous Provisions**.  Debtors and Bank agree that the following provisions are intended solely to reiterate (in some instances, in slightly different form) certain provisions that happened to appear in the Forbearance Agreement.  The absence, or restatement with slightly different terms, of certain provisions that appeared in a similar portion of the Forbearance Agreement does not indicate any intention of Debtors and Bank to delete provisions of the Forbearance Agreement, except where expressly stated herein.

8.1.    **Default**.  Any default by any Debtor in the performance of its, his or her obligations under this Agreement shall constitute a DIP Default.

8.2.    **Limitations on Certain Provisions Pursuant to Interim Order**.  The provisions of this Agreement are subject to the Interim Order to the extent that the Interim Order prohibits Borrower from agreeing to certain types of loan terms as established by Local Bankruptcy Rule 4001-2(d).  Debtors and Bank agree that any provision of this Agreement that is so prohibited by the Interim Order shall become effective upon entry of the Final Order. Debtors and Bank further agree that nothing in this Section 8.2 shall supersede or otherwise impair provisions previously agreed to by Debtors and Bank in other Loan Documents.

8.3.    **Release**.  Each Debtor, on such Debtor's behalf and, as applicable, on behalf of such Debtor's officers, directors, shareholders, administrators, heirs, beneficiaries, affiliates, subsidiaries, successors and assigns, hereby represents and warrants that such Debtor has no claims, counterclaims, setoffs, actions or causes of action, damages or liabilities of any kind or nature whatsoever, whether in law or in equity, in contract or in tort, whether now accrued or hereafter maturing (collectively, "Claims") against Bank, its direct or indirect parent corporation or any direct or indirect affiliates of such parent corporation, or any of the foregoing's respective directors, officers, employees, attorneys and legal representatives, or the heirs, administrators, successors or assigns of any of them (collectively, "Bank Parties") that directly or indirectly arise out of, are based upon or are in any manner connected with any Prior Related Event or the Bankruptcy Case.  Each Debtor, on such Debtor's behalf and, as applicable, on behalf of such Debtor's officers, directors, shareholders, administrators, heirs, beneficiaries, affiliates, subsidiaries, successors and assigns, voluntarily releases and forever discharges and indemnifies and holds harmless all Bank Parties from any and all Claims and other third-party claims that may be asserted against the Bank Parties, whether known or unknown, that directly or indirectly arise out of, are based upon or are in any manner connected with any Prior Related Event.  "Prior Related Event" means any transaction, event, circumstance, action, failure to act, occurrence of any type or sort, whether known or unknown, which occurred, existed, was taken, was permitted or begun in accordance with, pursuant to or by virtue of (i) any of the terms of any Loan Document or this Agreement, (ii) any actions, transactions, matters or circumstances related hereto or thereto, (iii) the conduct of the relationship between any Bank Party and any

16

Debtor, or (iv) any other actions or inactions by any Bank Party, all on or prior to the Signature Date.

8.4.    **Fees and Expenses.**  As a condition of this Agreement, Borrowers will pay to Bank all out-of-pocket expenses of Bank incurred in connection with Bank's response to the Existing Defaults, the Expected Financial Covenant Defaults, any DIP Default, or otherwise incurred in the negotiation, preparation and execution of this Agreement and related documents, instruments and agreements, and in the on-going monitoring of the performance of Debtors or the Loan Collateral, and the same shall become a part of the Obligations and shall be secured by all of the Loan Collateral.  Such expenses include, but are not limited to, UCC and other lien search costs, reasonable Attorneys' Fees, reasonable fees for accountants, consultants, internal and external auditors, and travel and related expenses for employees or representatives of Bank.  Nothing in this section shall limit the liability of Debtors for such continuing fees and expenses as are authorized under any of the Loan Documents.  Bank is hereby authorized to charge Borrower's loan account(s) for any and all such fees and out-of-pocket expenses.

8.5.    **Additional Miscellaneous Terms.**  This Agreement is a Loan Document.  This Agreement, together with the other Loan Documents, sets forth the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all previous understandings, written or oral, in respect of this Agreement.  When used herein, "including" is used by way of illustration and not by way of limitation.  The Financing Agreement and the Forbearance Agreement, as amended by this Agreement, will be construed as one agreement.  Any reference in any of the Loan Documents to the (i) Forbearance Agreement will be deemed to be a reference to the Forbearance Agreement as amended by this Agreement, (ii) Financing Agreement will be deemed to be a reference to the Financing Agreement as amended by this Agreement, and (iii) the "Revolving Loan Note" will be deemed to be a reference to the Amended and Restated Note.  This Agreement and the other Loan Documents being executed in connection herewith may be signed by facsimile signatures or other electronic delivery of an image file reflecting the execution hereof, and if so signed, (a) may be relied on by each party as if the document were a manually signed original and (b) will be binding on each party for all purposes.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all which together shall constitute one and the same agreement.  If any term of this Agreement is found invalid under Ohio law or laws of mandatory application by a court of competent jurisdiction, the invalid term will be considered excluded from this Agreement and will not invalidate the remaining terms of this Agreement.  At no time shall the prior or subsequent course of conduct by any Debtor or Bank directly or indirectly limit, impair or otherwise adversely affect any of the parties' rights or remedies in connection with this Agreement or any of the documents, instruments and agreements executed in connection herewith, as Bank and Debtors agree that this Agreement and the documents, instruments and agreements executed in connection herewith shall only be amended by written instruments executed by Bank and Debtors.  This Agreement is made and entered into for the protection and benefit of Bank and Debtors and their permitted successors and assigns, and no other person, association, authority or entity shall be a direct or indirect beneficiary of or have any direct or indirect cause of action or claim in connection with this

17

IN WITNESS WHEREOF, Bank and Debtors have executed this Agreement to be effective as of the Effective Date.

**[NOTE: THIS AGREEMENT CONTAINS A JURY TRIAL WAIVER PROVISION.]**

**PATRIOT STEEL, INC., Debtor in Possession**

By: _Jack D. Cook_____
    Jack D. Cook, President

_Jack D. Cook_____
**JACK D. COOK**

_Chrystal D. Jones_____
**CHRYSTAL D. JONES**


Accepted as of the Effective Date.

**U.S. BANK NATIONAL ASSOCIATION**

By: _____
    Suzanne E. Geiger, Senior Vice President

SIGNATURE PAGE TO
AMENDED AND RESTATED FINANCING AGREEMENT AND FORBEARANCE AGREEMENT WITH
DEBTOR IN POSSESSION

EXHIBIT ___A___

# AMENDED AND RESTATED REVOLVING LOAN NOTE

$3,000,000.00

Cincinnati, Ohio
July 1, 2008
First Amendment and Restatement March 27, 2009
Second Amendment and Restatement June 26, 2009
Third Amendment and Restatement August 26, 2009
Fourth Amendment and Restatement November 26, 2009
Fifth Amendment and Restatement February 24, 2010
Sixth Amendment and Restatement August 16, 2010
(Effective Date)

For value received, the undersigned, **PATRIOT STEEL, INC.**, an Indiana corporation ("Borrower"), hereby promises to pay to the order of **U.S. BANK NATIONAL ASSOCIATION**, a national banking association ("Bank"), on the Maturity Date under the Financing Agreement dated as of July 1, 2008 between Bank and Borrower, as amended by the Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated as of March 27, 2009, the First Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of June 26, 2009, the Second Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of August 26, 2009, the Third Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of November 26, 2009, the Fourth Amendment to Forbearance and Reaffirmation Agreement and Amendment to Loan Documents dated to be effective as of February 24, 2010, and the Amended and Restated Financing Agreement and Forbearance Agreement with Debtor in Possession dated to be effective as of even date herewith (as amended and as the same may hereafter be further amended, supplemented or restated from time to time, the "Financing Agreement"), in lawful money of the United States of America and in immediately available funds, the principal sum of THREE MILLION AND 00/100 DOLLARS ($3,000,000.00) or, if less, the aggregate unpaid principal amount of all Revolving Loans made by Bank to Borrower pursuant to the terms of the Financing Agreement, together with interest from the date hereof until this Amended and Restated Revolving Loan Note (this "Note") is fully paid on the principal amount hereunder remaining unpaid from time to time, computed in the manner, and at the rates from time to time in effect, under the Financing Agreement. The principal hereof and interest accruing thereon shall be due and payable as provided in the Financing Agreement.

This Note is the Revolving Loan Note referred to in the Financing Agreement and is entitled to the benefits and security, and is subject to the terms and conditions, of the Financing Agreement, including, without limitation, acceleration upon the terms provided therein and in the other Loan Documents. All capitalized terms used herein which are defined in the Financing Agreement and not otherwise defined herein shall have the meanings given in the Financing Agreement.

This Note is subject to voluntary and mandatory prepayment, in full or in part, in accordance with, and subject to the terms of, the Financing Agreement.

Upon the occurrence of an Event of Default (including, without limitation, a Forbearance Default or DIP Default), and after the lapse of any applicable period of cure, the outstanding principal balance hereunder, together with any accrued but unpaid interest and together with all of the other Obligations, may be accelerated and become immediately due and payable at the option of Bank and without demand or notice of any kind (which are hereby expressly waived by Borrower).

Borrower hereby agrees to pay all costs of collection, including Attorneys' Fees, if this Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand for payment, notice of dishonor and protest are hereby expressly waived by Borrower.

THIS NOTE HAS BEEN DELIVERED AND ACCEPTED AT AND SHALL BE DEEMED TO HAVE BEEN MADE AT CINCINNATI, OHIO.  THIS NOTE SHALL BE GOVERNED BY THE INTERNAL LAWS OF THE STATE OF OHIO (WITHOUT REFERENCE TO OHIO CONFLICTS OF LAW PRINCIPLES).

AS A SPECIFICALLY BARGAINED INDUCEMENT FOR BANK TO ENTER INTO THE FINANCING AGREEMENT AND EXTEND AND CONTINUE TO EXTEND CREDIT TO BORROWER, BORROWER AND BANK AGREE THAT ANY ACTION, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS NOTE, ITS VALIDITY OR PERFORMANCE, AND WITHOUT LIMITATION ON THE ABILITY OF BANK, ITS SUCCESSORS AND ASSIGNS, TO EXERCISE ALL RIGHTS AS TO THE LOAN COLLATERAL AND TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO REPAYMENT OF THE OBLIGATIONS, SHALL BE INITIATED AND PROSECUTED AS TO BORROWER AND BANK AND THEIR SUCCESSORS AND ASSIGNS AT CINCINNATI, OHIO OR IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF INDIANA.  BANK AND BORROWER EACH CONSENT TO AND SUBMIT TO THE EXERCISE OF JURISDICTION OVER THEIR RESPECTIVE PERSONS BY ANY COURT SITUATED AT CINCINNATI, OHIO HAVING JURISDICTION OVER THE SUBJECT MATTER, AND CONSENT THAT ALL SERVICE OF PROCESS BE MADE BY CERTIFIED MAIL DIRECTED TO BORROWER AND BANK AT THEIR RESPECTIVE ADDRESSES SET FORTH IN THE FINANCING AGREEMENT OR AS OTHERWISE PROVIDED UNDER THE LAWS OF THE STATE OF OHIO.  BORROWER WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

AS A SPECIFICALLY BARGAINED INDUCEMENT FOR BANK TO ENTER INTO THE FINANCING AGREEMENT AND EXTEND AND CONTINUE TO EXTEND CREDIT TO BORROWER, BORROWER AND BANK EACH WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS NOTE OR THE CONDUCT OF THE RELATIONSHIP BETWEEN BANK AND BORROWER.

- 2 -

This Note is issued, not as a refinancing or refunding of or payment toward, but as a continuation of, the Prior Note Obligations, together with any and all additional Revolving Loans incurred under this Note; *provided* that the unpaid principal balance of such Prior Note Obligations, together with any and all such additional Revolving Loans incurred under this Note, shall not exceed the maximum principal amount of this Note (the "Principal Amount Cap"). Accordingly, this Note shall not be construed as a novation or extinguishment of the Prior Note Obligations, and its issuance shall not affect the priority of any Lien granted in connection with the Prior Note. This Note amends and restates the Prior Note in its entirety. Interest accrued under the Prior Note prior to the date of this Note remains accrued and unpaid under this Note and does not constitute any part of the principal amount of the Indebtedness evidenced hereby. The entire unpaid principal balance of the Prior Note Obligations shall, together with any and all additional Revolving Loans incurred under this Note, continue in existence under this Note up to the Principal Amount Cap, which Obligations (including, but not limited to, such Prior Note Obligations) Borrower acknowledges, affirms, and confirms to Bank. The Indebtedness evidenced by this Note will continue to be secured by all of the Loan Collateral and other security granted to, or for the benefit of, Bank under the Prior Note and the other Loan Documents. As used herein, (i) "Prior Note" means that certain Amended and Restated Revolving Loan Note dated as of February 24, 2010, made by Borrower to the order of Bank in the principal amount of $4,750,000, (together with all prior amendments thereto or restatements thereof) and (ii) "Prior Note Obligations" means the Obligations of Borrower to Bank created or existing under, pursuant to, as a result of, or arising out of, the Prior Note.

*[Signature Page Follows]*

- 3 -

In Witness Whereof, Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place set forth above.

**[NOTE: THIS INSTRUMENT CONTAINS A JURY TRIAL WAIVER PROVISION.]**

**PATRIOT STEEL, INC., Debtor in Possession**

By: _Jack D. Cook_____
      Jack D. Cook, President

SIGNATURE PAGE TO
AMENDED AND RESTATED REVOLVING LOAN NOTE
(Patriot Steel, Inc.)
(Amended and Restated Financing Agreement and
Forbearance Agreement with Debtor In Possession)

**EXHIBIT B**

4.C

## Patriot Steel - Cash Flow ($000's)

| Collateral | August Week Ending 8/29/2010 | September Week Ending 9/5/2010 | September Week Ending 9/12/2010 | September Week Ending 9/19/2010 | September Week Ending 9/26/2010 | October Week Ending 10/3/2010 | October Week Ending 10/10/2010 | October Week Ending 10/17/2010 | October Week Ending 10/24/2010 | October Week Ending 10/31/2010 | November Week Ending 11/7/2010 | November Week Ending 11/14/2010 | November Week Ending 11/21/2010 | August | September | October | November |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning A/R | 501 | 481 | 528 | 638 | 810 | 1,038 | 1,262 | 1,408 | 1,489 | 1,490 | 1,566 | 1,542 | 1,573 | | | | |
| Net A/R | | | | | | | | | | | | | | | | | |
| Sales | 30 | 95 | 175 | 200 | 250 | 250 | 200 | 200 | 300 | 300 | 250 | 300 | 300 | 30 | 720 | 850 | |
| Credits | (50) | (50) | (92) | (29) | (24) | (24) | (54) | (119) | (199) | (274) | (244) | (268) | (211) | | (590) | (943) | (597) |
| Collections | | | | | | | | | | | | | | | | | |
| Misc. Adjustments | | | | | | | | | | | | | | | | | |
| Ending A/R | 481 | 528 | 638 | 810 | 1,038 | 1,262 | 1,408 | 1,489 | 1,490 | 1,566 | 1,542 | 1,573 | 1,662 | | | | |
| Beginning Inventory | 1,130 | 1,181 | 1,208 | 1,288 | 1,310 | 1,371 | 1,391 | 1,370 | 1,391 | 1,412 | 1,492 | 1,552 | 1,571 | | | | |
| Purchases | 78 | 185 | 185 | 225 | 225 | 185 | 185 | 185 | 285 | 285 | 285 | 285 | 285 | | | | |
| ROA | (25) | (78) | (144) | (164) | (205) | (184) | (164) | (164) | (164) | (205) | (205) | (246) | (246) | | | | |
| Available Inventory | 1,181 | 1,288 | 1,310 | 1,371 | 1,391 | 1,370 | 1,391 | 1,412 | 1,492 | 1,513 | 1,571 | 1,608 | 1,571 | | | | |
| Ineligibles | 235 | 279 | 381 | 532 | 727 | 921 | 1,046 | 1,119 | 1,123 | 1,190 | 1,172 | 1,201 | 1,277 | | | | |
| Net Inventory | | | | | | | | | | | | | | | | | |
| ROA | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | 85% | | | | |
| Available Inventory | 660 | 712 | 737 | 774 | 786 | 774 | 786 | 799 | 859 | 847 | 882 | 894 | 905 | | | | |
| Seasonal Overadvance | | | | | | | | | | | | | | | | | |
| Total Available | 898 | 891 | 1,118 | 1,306 | 1,512 | 1,695 | 1,834 | 1,918 | 1,982 | 2,037 | 2,045 | 2,095 | 2,162 | | | | |
| Loan | | | | | | | | | | | | | | | | | |
| Beginning Loan Balance | 772 | 678 | 698 | 764 | 889 | 1,121 | 1,333 | 1,521 | 1,608 | 1,703 | 1,735 | 1,783 | 1,823 | | | | |
| Collections | (150) | (150) | (92) | (29) | (24) | (24) | (54) | (119) | (199) | (224) | (274) | (269) | (211) | | | | |
| Capital Infusion | | | | | | | | | | | | | | | 1,200 | | |
| Advances | | | | | | | | | | | | | | | | | |
| Payroll | 81 | 170 | 190 | 230 | 230 | 190 | 180 | 190 | 270 | 230 | 270 | 270 | 270 | | 123 | | |
| Insurance (Hlth & Casualty) | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | | 100 | | |
| Rent | | | | | | | | | | | | | | | 114 | | |
| Utilities | 3 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | | 54 | | |
| Freight Out | | | | | | | | | | | | | | | 12 | | |
| Interest | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 7 | 7 | 7 | 44 | | 24 | 90 | 12 |
| Bank | | | | | | | | | | | | | | | 30 | 44 | 54 |
| Misc. Expenses | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 5 | 5 | 5 |
| Ending Loan Balance | 678 | 698 | 764 | 889 | 1,121 | 1,333 | 1,521 | 1,608 | 1,703 | 1,735 | 1,783 | 1,823 | 1,950 | | 14 | 18 | 18 |
| Letters of Credit | | | | | | | | | | | | | | | 5 | 5 | 5 |
| Reserves | | | | | | | | | | | | | | 23 | 140 | 185 | 159 |
| Ending Availability | 219 | 203 | 354 | 417 | 392 | 362 | 334 | 310 | 279 | 301 | 272 | 272 | 232 | (18) | 42 | (0) | |
| Collections | | | | | | | | | | | | | | | | | |
| Collections on New Sales | | | | | | | | 30 | 85 | 200 | 250 | 250 | 200 | | | | |
| Existing Accounts Receivable | | | | | | | | | | | | | | | | | |
| Collection on A/R 0-30 | 20 | 20 | 12 | 12 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | | 72 | 90 | 54 |
| Collections A/R 31-60 | 23 | 23 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | | | | | 12 | 12 | 44 |
| Collections A/R 61-90 | 7 | 7 | 7 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | | | | | 24 | 30 | 5 |
| Collections A/R 91+ | 50 | 50 | 62 | 29 | 24 | 24 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 30 | 15 | 18 |
| Accounts Payable | | | | | | | | | | | | | | | | | |
| Beginning Accounts Payable | 3,743 | 3,738 | 3,733 | 3,728 | 3,723 | 3,718 | 3,713 | 3,708 | 3,703 | 3,698 | 3,693 | 3,688 | 3,683 | | | | |
| Purchases | 78 | 185 | 185 | 225 | 225 | 185 | 185 | 185 | 285 | 285 | 285 | 285 | 285 | | | | |
| Disbursements | (81) | (170) | (190) | (230) | (230) | (190) | (190) | (190) | (290) | (270) | (270) | (270) | (270) | | | | |
| Ending Accounts Payable | 3,738 | 3,733 | 3,728 | 3,723 | 3,718 | 3,713 | 3,708 | 3,703 | 3,698 | 3,683 | 3,688 | 3,683 | 3,678 | | | | |
| Disbursements on existing AP | (50) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | | | | |
| Disbursements on new sales purcha | (81) | (185) | (185) | (225) | (225) | (185) | (185) | (185) | (265) | (270) | (265) | (265) | (265) | | | | |
| | 3,738 | 3,733 | 3,728 | 3,723 | 3,718 | 3,713 | 3,708 | 3,703 | 3,683 | 3,668 | 3,668 | 3,683 | 3,678 | | | | |

Assumptions:
1. Collections
2. An additional $25K of inventory will be purchased each week to replenish stock.
3. November's loss is due to only 3 weeks sales with a full month of rent reflected.

Footnote: An additional $25K of inventory will be purchased each week with a full month of rent reflected.

## Debtor in Possession
## Junior Credit Security Agreement

Comes now Patriot Steel Inc., an active Indiana corporation, with its principal office located at 3350 Claremont Avenue, Evansville, Indiana 47712, ("Debtor") and furthermore comes now Jack D. Cook of 4801 Royal Oak Drive, Evansville, Indiana, 47720 ("Secured Party", "Junior Lender") and the parties now contract and state their agreement ("Junior Credit Agreement"), as follows:

Debtor has advised Secured Party that Debtor intends to seek reorganization of its affairs by filing a Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Southern District of Indiana, Evansville Division, on or about August 16, 2010. Debtor has requested Secured Party to extend DIP Financing to Debtor, which Secured Party has agreed to do, all on, and subject to the terms and conditions set forth in this agreement. Both Debtor and Secured Party assert and affirm that none of the provisions contained in this agreement are the type of loan terms and provisions described in Local Bankruptcy Rule 4001-2(b).

Under Section 364 of the U.S. Bankruptcy Code, Debtor can only obtain financing after the date on which the Bankruptcy Petition is filed ("Petition Date") and only with the approval of the Bankruptcy Court. Provided that such approval is granted by means of an Interim Order of the Bankruptcy Court in a form approved by Secured Party, Secured Party and Debtor have agreed that the DIP Financing will commence as of the effective date and it will mature 21 days after the Petition Date. Upon approval of the DIP Financing by a Final Order of the Bankruptcy Court in a form approved by Secured Party, Secured Party and Debtor have agreed that the DIP Financing will continue and mature upon the entry of a Confirmation Order of a Plan of Reorganization, or the passage of 26 weeks after the Petition Date, which ever first occurs.

For value received, the sufficiency of which is hereby acknowledged, Debtor grants to Secured Party a junior security interest in, and agrees and acknowledges that Secured Party has and shall continue to have a second security interest in, the Debtor's property (as that term is hereinafter defined) now owned as well as any and all hereafter acquired property, whether acquired from funds directly provided by Secured Party, or from funds provided by a certain financing agreement confirmed as of July 20th 2010 between the Secured Party and Evansville Teachers Federal Credit Union ("Teachers"), whereby funds in the amount of Five Hundred Thousand Dollars ($500,000) ("Funds") will be advanced to Debtor on behalf of Secured Party by means of Teachers' direct disbursement of Funds based upon purchase orders to the suppliers of inventory associated with the usual and customary operations of Debtor's business as a full line steel service center.

The parties further acknowledge the existence of a superior financing and forbearance agreement ("Senior Obligations", "Senior Loan Documents") which exists between the Debtor and U.S. Bank National Association, 425 Walnut Street, Cincinnati, OH 45202 Attn., Ms. Suzanne E. Geiger, Senior Vice President ("Bank", "Senior Lender").

Notwithstanding anything herein to the contrary, (i) the obligations evidenced by this Junior Credit Agreement are subordinated to the prior payment in full of the Senior Obligations above referenced with Bank (as defined in the Subordination and Intercreditor Agreement hereafter referred to) pursuant to, and to the extent provided in, the Subordination and



EXHIBIT _____

Intercreditor Agreement dated as of August 16, 2010 (as amended, restated, supplemented or modified from time to time the "Subordination and Intercreditor Agreement") in favor of Bank (together with its successors and assigns and any other holders of the Senior Obligations identified therein, the "Senior Lender"), (ii) the liens and security interests granted to the Junior Lender pursuant to this Agreement are expressly subject and subordinate to the liens and security interests granted to Senior Lender, under the Senior Loan Documents (as defined in the Subordination and Intercreditor Agreement) and (iii) the exercise of any right or remedy by the Junior Lender hereunder is subject to the limitations and provisions of the Subordination and Intercreditor Agreement. In the event of any conflict between the terms of the Subordination and Intercreditor Agreement and the terms of this Junior Credit Agreement, the terms of the Subordination and Intercreditor Agreement shall govern.

1.  As used herein, terms are defined as follows:

(a) "Property" means all of Debtor's rights, titles and interests in and to all of Debtor's assets and property, tangible and intangible, real and personal, including:

   (i)    all of Debtor's accounts, chattel paper, deposit accounts, documents, equipment, fixtures, instruments, inventory, investment property, general intangibles, goods, and letter-of-credit rights;

   (ii)   all of Debtor's rights, titles and interests in and to the commercial tort claims listed, or required to be listed, in <u>Exhibit B</u> to this Agreement;

   (iii)  without limiting the description of the property or any rights or interests in the property described above in this definition of Collateral, all of Debtor's rights, titles and interests in and to (a) all of Debtor's money, cash, and other funds; (b) all attachments, accessions, parts and appurtenances to, all substitutions for, and all replacements of any and all of Debtor's equipment, fixtures and other goods; (c) all of Debtor's agreements, as-extracted collateral, tangible chattel paper, electronic chattel paper, health-care-insurance receivables, leases, lease contracts, lease agreements, payment intangibles, proceeds of letters of credit, promissory notes, records, and software; and (d) all of Debtor's franchises, customer lists, insurance refunds, insurance refund claims, tax refunds, tax refund claims, pension plan refunds, pension plan reversions, patents, patent applications, service marks, service mark applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, and licenses;

   (iv)   all supporting obligations;

   (v)    all of the products and proceeds of all of the foregoing described property and interests in property, including cash proceeds and noncash proceeds, and including proceeds of any insurance, whether in the form of original collateral or any of the property or rights or interests in property described above in this definition of Collateral; and

(vi)    all of the foregoing, whether now owned or existing or hereafter acquired or arising, or in which Debtor now has or hereafter acquires any rights, titles or interests.

Notwithstanding anything herein to the contrary, in no event shall the Collateral include any of Debtor's Integra Equipment, solely to the extent that, and only for such time that, Integra Bank, National Association has a valid and enforceable security interest in the Integra Equipment.

(b) "Junior Obligation" means all indebtedness and liabilities whatsoever of the Debtor to Secured Party, whether direct or indirect, absolute or contingent, due or to become due, whether now existing or hereafter arising and howsoever evidenced or acquired, and whether joint or several, including without limitation that certain Promissory Note Supporting Junior Credit Security Agreement.

(c) "Collateral" means all inventory and property from time to time subject to the security interest herein provided for, including but not limited to all proceeds of any such inventory and property.

(d) "DIP Financing" means financing provided by Secured Party to Debtor, Postpetition, in accordance with section 364 of the U.S. Bankruptcy Code and this Agreement.

(e) "Interim Order" means a duly entered order of the Bankruptcy Court, in a form approved by Secured Party, authorizing Debtor to obtain DIP Financing from Secured Party on an "interim" (within the meaning of Rule 4001(c)(1)(b) of the Federal Rules of Bankruptcy Procedure) basis, e.g. such an order that is entered within the first 13 days after the Petition Date, before all of Debtor's creditors have received notice that Secured Party and Debtor are proposing to enter into the DIP Financing Agreement.

(f) "Final Order" means a duly entered order of the Bankruptcy Court, in a form approved in writing by Secured Party, authorizing Debtor to obtain DIP Financing from Secured Party, following a hearing held at least 14 days after service of Debtor's motion to authorize the DIP Financing, within the meaning of Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure.

(g) "Integra Equipment" means (i) all of Debtor's equipment and fixtures, whether now owned and existing or hereafter arising or acquired and (ii) all identifiable cash proceeds (a) received by Debtor upon the sale of any item of such equipment and/or fixtures to any third-party or (b) payable under any policy of insurance by reason of loss or damage to any item of such equipment or fixtures.

(h) All other terms used herein which are defined in the applicable Uniform Commercial Code (IC 26-1-9.1-102 et seq.) ("Code") have the same meaning herein as in the Code.

2.  Debtor represents, warrants, covenants and agrees:

(a) Except for the security interest of Bank, the Debtor is, and as to the inventory acquired after the date hereof shall be, the owner of all Property free from any liens, security interest, encumbrance or other right, title or interest, and the Debtor shall defend the Property and the proceeds thereof against all claims and demands of any persons at any time claiming the same or any interest therein adverse to Secured Party.

(b) Except for the Financing Statement or security agreement filed or to be filed in respect of and for the security interest of Bank, and Secured Party, there is no Financing Statement or security agreement now on file in any public office covering any of the Property or any proceeds thereof or in which the Debtor is named as or signs as a debtor and so long as any amount remains unpaid on any obligations to Bank or Secured Party, the Debtor will not execute nor permit to be executed on his or its behalf and there will not be filed in any public office any such Financing Statements or security agreements.

(c) All property presently owned by Debtor is and will be kept at, and all inventory hereafter acquired by Debtor will be kept at, 3350 Claremont Avenue, Evansville, IN 47712 and inventory shall not be kept at any other place without the prior written consent of the Secured Party.

(d) Debtor's chief place of business is that set forth at the beginning of this agreement and Debtor has no other place of business except said chief place of business. Debtor will not change the location of such chief place of business without first giving the Security Party fifteen (15) days prior written notice.

3. All funds made available to Debtor shall be such as the Secured Party may, in conjunction with Teachers, from time to time, determine. All loans shall be evidenced by a promissory note or other such writing or accounting entry of the Debtor in such form and containing such terms as the Secured Party may from time to time require. The proceeds of all funds made available by Secured Party will be used solely to enable Debtor to purchase inventory and Teachers is authorized to disburse the proceeds of any and all loans directly to or for the account of the seller of inventory upon Teacher's receipt of a copy of an applicable purchase order, and without any further order or direction from the Debtor other than this agreement.

4. The Debtor shall receive and hold all Property in trust solely for the purpose of exhibiting and selling the same in the ordinary course of business. Debtor shall keep the inventory clean, dry and in the same condition as received. Secured Party may require Debtor, at Debtor's expense to assemble the collateral at 3350 Claremont Avenue, Evansville, IN 47712, or such other place to be designated by Secured Party which is reasonably convenient to both parties.

5. The Debtor agrees to keep usually and customary accounts for all inventory and to furnish Secured Party a true and complete periodic report of all sales of any and all inventory. Secured Party shall have the right at any time and from time to time and without any hindrance or delay to examine the books and records of the Debtor with respect to any inventory and the sale thereof, and to examine and inspect all inventory

10. Debtor agrees to pay Secured Party interest upon funds advanced by Teachers for the benefit of Debtor, and upon all costs and expenses advanced by Secured Party as provided for herein at the rate of seven and one half percent (7.5%). However the interest rate will increase two (2) percentage points if Debtor's financial information and federal tax returns are not provided to Secured Party and Teachers within thirty (30) days of the tax filing deadline. If an extension of the tax return is filed, Debtor will provide copies of the extension documents with year-end internally prepared financial statements(s). All such interest under this agreement shall accrue until the maturity dates described herein above both as to the entry of an Interim Order and entry of a Final Order, at which time the interest and all outstanding principal sums shall be due.

11. Debtor shall be in default under this agreement and all obligations of Debtor to Secured Party shall, without demand or notice of any kind and notwithstanding any maturity date or dates expressed in any evidence of any obligations, become immediately due and payable upon the happening of any of the following events or conditions: (1) Default in the punctual payment of the Senior Obligation, and/or of the Junior Obligation referred to herein, or any part thereof; (2) Default on the punctual performance of any covenant or agreement contained in or referred to herein, except to the extent such covenant or agreement is preempted by the Subordination and Intercreditor Agreement; (3) Any warranty, representation or statement made or furnished to Secured Party by or on behalf of Debtor proves to have been false in any material respect when made or furnished; (4) Loss, theft, substantial damage, destruction, encumbrance to or of any of the collateral; (5) Such a change in the condition or affairs (financial or otherwise) of the Debtor as in the sole opinion of the Secured Party impairs his security or increases his risk.

12. If Debtor enters into default, as previously defined, Secured Party, subject to the terms and conditions contained in the Subordination and Intercreditor Agreement shall have all rights and remedies of a secured party under the Code including, without limitation, the right to take possession of the collateral and for that purpose the Secured Party may enter any premises and remove the same therefrom, all without legal process. Secured Party shall provide Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. Such requirement of reasonable notice shall be met if such notice is mailed, postage prepaid, to the address of Debtor shown at the beginning of this agreement at least five (5) days before the time of the sale or disposition. Debtor shall remain liable for any deficiency.

13. No warranties, express or implied, and no representations, promises or statements have been made by Secured Party unless endorsed hereon in writing. Any provision of this agreement prohibited by the law of any state shall, as to said state, be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof. This agreement has been accepted in the State of Indiana and all rights and obligations hereunder, including matters of construction, validity and performance shall be governed by the laws of the State of Indiana.

14. Secured Party shall not, by act, delay, omission or otherwise be deemed to have waived any rights or remedies, or both, hereunder unless such waiver be in writing and no waiver

Page 6

shall be valid unless signed by the Secured Party and only to the extent therein set forth; a waiver by Secured Party of any right or remedy, or both, under the terms of this agreement on any one occasion shall not be construed as a bar to or waiver of any such right or remedy, or both, under the terms of this agreement on any future occasion. No executory agreement shall be effective to change or modify or to discharge in whole or in part this agreement unless such executory agreement is in writing and signed by Secured Party. Secured Party and Debtor waive all rights to a trial by jury in any litigation relating to any transaction under this agreement. The rights of Secured Party specified in this agreement shall be in addition to, and not in limitation of, Secured Party's rights under the Code, as amended from time to time, or any other statute or rules of law conferring rights similar to those conferred by the Code, or of Secured Party's rights under any other agreement, note or instrument signed by Debtor's authorized representative. All rights of Secured Party, hereunder shall inure to the benefit of its successors and assigns; and all obligations of Debtor shall bind its representatives, successors or assigns. Either the Secured Party or the Debtor may terminate this agreement at any time upon written notice to the other party of such termination, provided, however, that such termination shall in no way affect any transactions entered into or rights created or obligations incurred prior to the receipt of such notice by the other party, as to which transaction, rights and obligations this agreement shall be fully operative until the same are fully disposed of, concluded and/or liquidated. Prior to such termination this shall be a continuing agreement in every respect. The terms "Debtor" shall include any alternate or successive business entity, person or enterprise, but the original Debtor shall not thereby be released from any liability.

15. This agreement shall become effective when it is approved by the United States Bankruptcy Court having jurisdiction over Debtor's anticipated Chapter 11 case in the Southern District of Indiana, and when it is signed by the authorized representative of Debtor and by the Secured Party.

IN WITNESS WHEREOF, Secured Party and Debtor have executed this Agreement on the ___17___ day of ___Aug___, 2010.

PATRIOT STEEL INC., "Debtor"

By: _Jack D. Cook_____
Jack D. Cook, President

_Jack D. Cook_____
Jack D. Cook, "Secured Party" "Junior Lender"

Page 7

and the proceeds thereof wherever located and for such purposes, Secured Lender may enter any premises without legal process. Furthermore, Debtor shall provide monthly balance sheets and income statements, no later than 15 days after months–end to both Secured Party and Teachers.

6. Debtor shall have and maintain insurance at all times with respect to all Property which is collateral, including goods in transit, against risk of fire, theft, and all other usual risks and such special risks as the Secured Party may designate from time to time, containing such terms, for such periods and written by such insurance companies as may be satisfactory to the Secured Party, such insurance to be payable first to the Bank to the extent of its then present interest in such collateral, and secondly to the Secured Party to the extent of his then present interest in such collateral, and then to the Debtor. All policies of insurance shall provide a for ten (10) days written minimum cancellation notice to the Secured Party. In the event of failure to provide insurance as herein provided, the Secured Party may, at his option, provide such insurance and Debtor shall pay to Secured Party on demand, the cost thereof. Debtor will abide by all of the terms and conditions contained in any policy of insurance. Debtor will promptly pay when due all taxes or assessments on the Property.

7. At Secured Party's request, Debtor agrees to execute and deliver such Financing Statement or statements or amendments thereof or supplements thereto, or other instruments as Secured Party in his discretion may from time to time deem necessary or desirable in order to comply with the Code and to preserve and protect the security interest granted.

8. Following the occurrence of the Facility Termination Date (as defined in the Amended and Restated Financing Agreement and Forbearance Agreement with Debtor in Possession by and among Patriot Steel, Inc., Jack D. Cook, Chrystal D. Jones and U.S. Bank National Association, dated August __, 2010) of the Senior Obligation, Debtor agrees on the day of the receipt by Debtor of any proceeds from the sale of any inventory to transmit the same to the Secured Party in the same form as received by the Debtor and Debtor agrees pending such transmittal to hold all such proceeds separate and apart from any property of the Debtor and in trust for Secured Party. All cash proceeds received by Secured Party shall be applied on the obligations of Debtor to Secured Party whether or not demand for payment thereof has been made by Secured Party.

9. At his option, the Secured Party may discharge taxes, liens or security interests or other encumbrances at any time levied or placed on any collateral, may pay for the maintenance and preservation of same, and Debtor agrees to reimburse Secured Party on demand for any payment made, or any expense incurred thereby, all of which shall have the benefit of and shall be secured by the security interest provided for hereunder. All costs and expenses of Secured Party in retaking, holding, preparing for sale, selling, leasing and the like, the collateral in the event of any default by Debtor, including court costs and reasonable attorneys' fees and legal expenses, shall likewise constitute additional indebtedness of the Debtor which the Debtor promises to pay on demand.

# Promissory Note
## Supporting Junior Credit Security Agreement

For value received, the undersigned, PATRIOT STEEL, INC., an active Indiana corporation ("Debtor"), hereby promises to pay to the order of JACK D. COOK, (Secured Party") on the Maturity Date(s) described in the Debtor in Possession Junior Credit Security Agreement, executed August __17__, 2010 ("Security Agreement"), in then available U.S. Dollars the principal sum of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) or, if different, the aggregate unpaid principal amount of all amounts loaned by the Secured Party to Debtor since the execution of this Promissory Note, pursuant to the terms of the Security Agreement, together with interest from the date hereof until this Promissory Note is fully paid as to any and all outstanding principal, from time to time, computed in the manner and at the rates from time to time in effect, under the Security Agreement.

This Promissory Note is as provided for in the Security Agreement and is entitled to the benefits and rights to enforcement as provided by the terms and conditions set out in the Security Agreement. This Promissory Note is subject to prepayment, in full or in part, in accordance with, and subject to the terms of the Security Agreement.

The parties agree that the distribution of funds under the Security Agreement and this Promissory Note shall be made by the Secured Party, from his Business Loan Agreement with the Evansville Teachers Federal Credit Union, which financial institution shall directly disburse such funds at the request of the Secured Party and for the benefit of the Debtor. The parties agree that distribution will be upon presentment of purchase orders for new inventory to be acquired by Debtor, and that the following amounts will be distributed on the following schedule:

a) $150,000 during the week ending August 29th 2010
b) $150,000 during the week ending September 5th 2010
c) $100,000 during the week ending September 12th 2010, and
d) $100,000 during the week ending September 19th 2010.

Upon the occurrence of an event of default or breach of the Security Agreement and upon Debtor's failure to cure the same as therein permitted, the outstanding principal balance hereunder, together with any accrued but unpaid interest and together with all of the other obligations under the Security Agreement and/or this Promissory Note, may be accelerated and become immediately due and payable at the option of Secured Party, without demand or notice of any kind.

Debtor agrees to pay all costs of collection, including attorneys' fees, if this Promissory Note is not paid when due, whether or not legal proceedings are commenced.

Presentment or other demand, notice of dishonor and protest are hereby expressly waived by Debtor.

This Promissory Note has been executed in Vanderburgh County, Indiana, and shall be governed by the laws of the State of Indiana. Furthermore, the parties hereby agree that any court situated in Vanderburgh County Indiana shall have exclusive jurisdiction over the subject matter of this Promissory Note and the enforcement or collection of the same.

Executed this 17 day of August, 2010.

PATRIOT STEEL, INC. "Debtor"
By:

Jack D. Cook, President

State of Indiana          )
                          ) SS:
County of Vanderburgh     )

Before me, the undersigned, a Notary Public in for said County and State, this 17 day of August, 2008 personally appeared Patriot Steel Inc., by its duly authorized President, Jack D. Cook who acknowledged the execution of the foregoing Promissory Note. In Witness Whereof, I have hereunto subscribed my name and affixed my Official Seal.

My Commission expires: February 28, 2016

Maurice Doll, Notary Public Commission Number 581242
A resident of Warrick County, Indiana

MAURICE DOLL
NOTARY PUBLIC
SEAL
STATE OF INDIANA
MY COMMISSION EXPIRES February 28, 2016

This instrument was prepared by Maurice Doll, *Morrie Doll & Associates llc,* Attorney at Law (IN Bar #4554-42) P.O. Box 703, Newburgh, Indiana 47629-0703 at the specific request of one or more of the parties based solely upon information supplied by one or more of the parties to this instrument and without examination of title or public records. The drafter assumes no liability for any errors, inaccuracy, or omissions in this instrument resulting from the information provided. The parties hereto signify their consent to this disclaimer by their execution and acceptance of this instrument.

I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security number in this document, unless it is required by law.

Maurice Doll, drafter of this document